IRVING, P.J.,
for the Court:
¶ 1. Morris Goodman Builders Inc. (Morris Goodman) filed suit against Barry W. Gilmer seeking to recover $83,951.78 in unpaid labor and expenses associated with the construction of Gilmer’s home. Gilmer filed a response to Morris Goodman’s complaint and a counterclaim against Morris Goodman, alleging breach of contract, breach of workmanship, breach of an express warranty, fraudulent inducement, and fraudulent misrepresentation. Following a jury trial, the Madison County Circuit Court entered judgment in favor of Morris Goodman in the amount of $83,951.78 and awarded Morris Goodman attorney’s fees in the amount of $28,542.46.
¶ 2. Feeling aggrieved, Gilmer appeals and asserts eight assignments of error, which we quote:
I. Whether the trial court abused its discretion by refusing to allow Mr. Gilmer to present jury instructions on his theory of fraudulent misrepresentation to the jury.
II. Whether the trial court abused its discretion by allowing Mr. Jim Goodman to offer expert testimony on matters outside his scope of expertise.
III. Whether the jury verdict in favor of Morris Goodman Builders was against the overwhelming weight of the evidence.
IV. Whether the trial court abused its discretion in awarding attorney’s fees to counsel for Appellee by failing to require credible evidence of the reasonableness of fees charged and the necessity of services rendered.
V. Whether the trial court erred in allowing fact witness Wade Buie to testify as to hearsay engineering information concerning the I-joists installed in Appellant’s house.
VI. Whether the trial court erred in failing to consider or properly apply paragraph VIII of the construction contract holding Appellant harmless from any claims arising out of construction, including attorney’s fees.
VII. Whether the trial court erred by allowing counsel for Appellee to engage in a systematic trial tactic of personal attacks upon Appellant and delivery of an inflammatory closing argument alleging abuse of the judicial system without a proper basis in fact or law.
VIII. Whether the trial court erred in allowing counsel for Appellee to commit a fraud upon the jury by presentation of false demonstrations during closing argument.
¶ 3. Finding no error, we affirm.
FACTS
¶ 4. In 1993, Gilmer began contemplating building a house on land that he owned in Madison County, Mississippi. *1206 Gilmer had observed houses built by Morris Goodman and decided to hire the company to build his house. In 2000, Gilmer spoke with Jim Goodman (Jim), the company's owner, about hiring the company to build the house. Gilmer told Jim that he wanted to model his house after a house that belonged to one of Gilmer’s acquaintances in Philadelphia, Mississippi. The two traveled to Philadelphia, and Jim took numerous measurements and made notes regarding the layout of the house. Jim used photos that he took at the house and a partial set of the home’s blueprints to draft a set of blueprints for Gilmer’s house. Throughout the building process, Gilmer called Jim’s attention to several defects concerning the framing of the house, the laying of bricks, and the placement and protection of building materials. Although Gilmer paid the initial bills from Morris Goodman, he stopped paying in June 2001. Morris Goodman ceased all work on Gilmer’s house and left the job.
¶ 5. At trial, Jim testified that he went into the construction business with his father after he graduated from high school. When Jim’s father retired in 1995, Jim took over the business. Over the years, Jim has worked in every aspect of home building with the exception of the mechanical and electrical aspects. Jim stated that he had extensive experience in reading plans for the construction of a house but admitted that he had no formal training as an architect. Prior to beginning construction on Gilmer’s house, Jim had built more than fifty homes and supervised the construction on each. Without objection from Gilmer, the court accepted Jim as an expert in the field of residential construction.
¶ 6. Jim stated that he took several pictures and extensive measurements while visiting the house in Philadelphia with Gil-mer. Gilmer asked him if he could draw plans for the house, and he told Gilmer that he could. After drawing the plans, Jim and Gilmer met to discuss costs and to sign a contract allowing Morris Goodman to begin building Gilmer’s house under Jim’s supervision.
¶ 7. According to Jim, the prices for the materials were reasonable, and the work performed during construction met all applicable industry standards. Gilmer chose the windows that Morris Goodman installed in the house. Additionally, Gilmer chose the style of brick for the house. Jim testified that Morris Goodman’s method of framing would accommodate any style of brick. Jim noted that the space between the bricks and the wall of the house met the standard set by the Southern Building Code. Jim could recall only one time that Gilmer expressed some dissatisfaction with his workmanship. However, Jim fixed the problem that Gilmer found at no extra cost to Gilmer and reimbursed him for materials and labor. Jim stated that all of the work performed on Gilmer’s house and all of the materials used in construction were at or above industry standards.
¶ 8. Morris Goodman hired Dale Harrell as a subcontractor to frame Gilmer’s house. Harrell testified that he had worked in construction for approximately thirty years. Harrell described the job on Gilmer’s house as “typical.” He stated that he framed Gilmer’s house according to the industry standards that were applicable at that time. He insisted that he inspected all of the materials that he and his crew used in framing Gilmer’s house so that he could avoid having to “cull” any of the wood before the crew installed sheet-rock. Harrell also stated that he framed the house for the type of brick that Gilmer had chosen.
¶ 9. Harrell also testified regarding the I-joists that he installed in the garage house. He recalled that the blueprints called for sixteen-inch I-joists. However, *1207 the manufacturer shipped I-joists that measured only twelve inches. Jim alerted the manufacturer of the mistake, and the manufacturer shipped an additional set of twelve-inch I-joists. Harrell installed the twelve-inch I-joists as directed. He noted that it would have taken an additional two weeks to receive the correct-sized joists.
¶ 10. Wayne Ellis testified that he had been a brick mason for forty-six and one-half years, and Morris Goodman hired him to perform the brick work on Gilmer’s house. Ellis detailed the preparations and labor involved in laying brick on a two-story home. He stated that the type of brick that will be used on the house only affects the house’s framing by changing the amount of space that should be between the brick and the house. Ellis also constructed the chimneys on Gilmer’s house. He stated that the chimneys were built according to industry standards. On cross-examination, Ellis admitted that they had to tear down at least one wall because the bricks were not meeting the window framing like Gilmer had requested. Additionally, on cross-examination, after viewing current photos of the chimneys at Gil-mer’s house, Ellis admitted that one of the chimneys depicted was not plumb. He, nevertheless, insisted that the chimneys that he erected were plumb at the time he built them.
¶ 11. Brad Sellers, zoning administrator for Madison County, testified that one of the county’s inspectors inspected Gilmer’s house throughout construction. The final inspection on Gilmer’s house occurred on October 24, 2008, and the house had passed the inspection. Sellers also noted that cutting or culling ten percent or more of the wall studs in a house would make the house unacceptable, and the house would not pass inspection.
¶ 12. Donnie Edwards testified as an expert in carpentry and framing. Edwards stated that he had been in the construction business for forty years and had experience building and remodeling residential and commercial properties. Gil-mer hired Edwards in 2002 after Morris Goodman left the project. Edwards stated that he discovered that the chimneys at Gilmer’s house were not plumb. Additionally, even though the house was weatherproofed when he arrived, he had to replace approximately ninety percent of the studs in the house because they had been cut or culled. He observed a wall in the kitchen that was in the wrong place. As a result, the hallway and at least two bedroom doorways were too narrow. According to Edwards, the framing on Gilmer’s house was below industry standards, and the house had not been constructed in a workmanlike manner.
¶ 13. Scott Garrett testified as Gilmer’s masonry expert. In 2007, Gilmer hired Garrett to examine and correct the brickwork on his house. Garrett stated that most of the brick had been removed from the house before he got there, but enough brick remained to examine the space between the brick and the wall. Garrett noted that the space between the drywall and the inside of the brick should be one-half inch to three-quarters of an inch. If the space between the brick and the wall was more than three-quarters of an inch, the brick ties would not be sufficiently connected to the walls to hold the two together. Garrett also noted that there is a difference in framing with respect to regular-sized and queen-sized brick. The difference is that, because the queen-sized brick is narrower, the cornice in the framing is not as wide. Garrett opined that the brickwork on Gilmer’s house was not high-quality work. During cross-examination, Garrett admitted that he was unsure about the industry standards for masonry during 2000 and 2001.
*1208 ¶ 14. Gilmer testified that he initially spoke with Jim’s father, Morris, about building his house. According to Gilmer, the elder Goodman had a reputation for building high-quality homes. However, before Gilmer decided to proceed with his plans for a new house, the elder Goodman had retired, leaving Jim as the owner. Gilmer confirmed that he and Jim visited the house in Philadelphia where Jim took measurements and photographs. Sometime later, Jim presented Gilmer with a construction contract, which Gilmer signed. Jim also represented to Gilmer that his house would be constructed using premium materials. Soon after Gilmer signed the contract, Morris Goodman began building Gilmer’s house. As construction progressed, Gilmer learned that Morris Goodman had only one employee and “operated 100 percent off of [subcontractors].”
¶ 15. Gilmer first complained to Jim about the placement and storage of materials once they were delivered to the construction site. If the builders were not there, the materials would be left in mud or water. Additionally, the materials were frequently left in the rain. Gilmer also complained about some of the brickwork on the house. Morris Goodman’s subcontractor removed the brick wall that contained the defect and rebuilt it. Gilmer then complained about the construction of the chimneys. According to Gilmer, the chimneys were out of plumb. Also, the bricks did not meet the window edges as Gilmer had requested. Furthermore, contrary to Jim’s assertions, Gilmer did not authorize any of the changes that Jim made to the plans for the house mid-construction.
¶ 16. Gilmer admitted that he paid the initial bills from Morris Goodman but that he stopped paying Morris Goodman when he became concerned that Morris Goodman was not building a quality home. Gil-mer stated that he arranged to meet with Jim to discuss his concerns, but when Gil-mer arrived at the construction site, Jim had removed all of the equipment belonging to Morris Goodman. Days later, Jim went to Gilmer’s home and requested the past-due payment. When Gilmer refused to pay Jim until he corrected some of the work on the house, Jim left.
¶ 17. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

I. Jury Instructions

¶ 18. Gilmer contends that the circuit court erred by refusing to allow jury instructions regarding fraudulent misrepresentation. Specifically, Gilmer requested a jury instruction concerning fraudulent misrepresentation by the elder Goodman, which the circuit court refused on the ground that there was no evidence to support Gilmer’s claim.
¶ 19. The Mississippi Supreme Court has previously stated the standard of review for jury instructions as follows:
The instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case. However, the trial judge may also properly refuse the instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case.
Nunnally v. R.J. Reynolds Tobacco Co., 869 So.2d 373, 378 (¶ 7) (Miss.2004) (quoting Howell v. State, 860 So.2d 704, 761 (¶ 203) (Miss.2003)). In his counterclaim, *1209 Gilmer alleged that Jim fraudulently misrepresented the quality of the company’s work. During the jury conference, Gilmer sought to amend his counterclaim to add the elder Goodman.
¶ 20. To establish a claim for fraudulent misrepresentation, Gilmer must show by clear and convincing evidence:
(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker’s knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer’s ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.
Holland v. Peoples Bank & Trust Co., 3 So.3d 94, 100 (¶ 13) (Miss.2008) (quoting Bank of Shaw v. Posey, 573 So.2d 1355, 1362 (Miss.1990)). The elder Goodman was not an original party to Gilmer’s counterclaim, and Morris Goodman was not on notice that the elder Goodman’s acts or omissions might be a basis for liability. Nevertheless, Gilmer contends that his testimony about his initial conversation with the elder Goodman provides sufficient evidence to support the requested jury instruction. We disagree.
¶ 21. Gilmer testified that he relied on the elder Goodman’s reputation when choosing Morris Goodman as his contractor. It is undisputed, however, that the elder Goodman was never involved in the construction of Gilmer’s home and that Gilmer never spoke to the elder Goodman after 1993. Furthermore, Gilmer does not state what representations, if any, that the elder Goodman made to him regarding the quality of the construction of his home. Accordingly, the circuit court did not err in refusing the fraudulent-misrepresentation jury instruction. This issue is without merit.

II. Expert Testimony

¶ 22. At trial, Morris Goodman offered Jim as an expert in the broad field of residential construction. Jim testified regarding blueprints, installing I-joists, and bricklaying. Gilmer argues that the circuit court erred in allowing Jim to testify to matters outside his area of expertise.
¶23. Our supreme court has established that the admission of expert testimony lies within the sound discretion of the circuit court. Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (¶ 4) (Miss.2003). Rule 702 of the Mississippi Rules of Evidence provides factors that must be satisfied in order for expert testimony to be admissible:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of rehable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶24. “However,, a witness need not be a specialist in any particular profession to testify as an expert.” Univ. of Miss. Med. Ctr. v. Pounders, 970 So.2d 141, 146 (¶ 17) (Miss.2007) (citing Hubbard v. Wansley, 954 So.2d 951, 957 (¶ 13) (Miss.2007)). “The scope of the witness’s knowledge and experience ... governs the question of admissibility.” Id. (citing West v. Sanders Clinic for Women, P.A., 661 So.2d 714, 719 (Miss.1995)). Furthermore, our supreme court has affirmed that “a witness may qualify to give an expert opinion through his experience only.” McKee *1210 v. Bowers Window & Door Co., 64 So.3d 926, 935 (¶ 24) (Miss.2011) (quoting Cain v. Mid-South Pump Co., 458 So.2d 1048, 1050 (Miss.1984)).
¶ 25. Here, Jim’s forty years of experience as a residential contractor certainly qualified him to provide expert testimony in that field, in spite of his testimony that he had no formal education on the matter. Jim testified that throughout his forty-year career, he had performed every aspect of residential construction, including drafting blueprints, installing I-joists, and laying brick, with few exceptions. He testified regarding only those aspects of construction that he was familiar with and that were important to Gilmer’s concerns about the construction of his house. As such, the circuit court did not abuse its discretion in allowing Jim to testify as an expert witness, and his testimony was not outside his area of expertise. This issue is without merit.

III. Weight of the Evidence

¶ 26. Gilmer contends that the jury’s verdict is against the overwhelming weight of the evidence. Specifically, Gil-mer argues that the jury’s verdict cannot stand because the jury disregarded the uncontradicted expert testimony offered during trial. We disagree.
¶ 27. Appellate courts will only disturb a jury’s verdict “in those cases where the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice[.]” Robinson Prop. Grp., Ltd. P’ship v. McCalman, 51 So.3d 946, 948 (¶ 9) (Miss.2011) (citations omitted). When determining whether a jury’s verdict is against the overwhelming weight of the evidence, this Court has stated that “the scope of review on this issue is limited in that all evidence must be construed in the light most favorable to the verdict[.]” R. McKnight & Son v. C & I Entm’t, 100 So.3d 1022, 1026 (¶ 11) (Miss.Ct.App.2012) (quoting Winding v. State, 908 So.2d 163, 167 (¶ 18) (Miss.Ct.App.2005)).
¶ 28. After considering the evidence that supports the verdict, we find that the verdict is not against the weight of the evidence. Jim testified that he constructed Gilmer’s house according to the building regulations that were applicable during that time. Morris Goodman’s subcontractors testified that they had also followed the applicable building regulations. While Gilmer presented testimony from other expert witnesses regarding the building regulations, none of Gilmer’s experts testified that the regulations that Jim followed were incorrect. Additionally, Morris Goodman’s framer stated that he had not cut or culled any of the studs used to frame Gilmer’s house. While one of Gilmer’s experts testified that over ninety percent of the home’s frame consisted of cut or damaged studs, the expert also admitted that he had inspected the house over one year after Morris Goodman left the job and could not say that the cut and damaged studs had been put in place by Morris Goodman or any of its subcontractors.
¶ 29. As our supreme court has stated, “if the evidence is conflicting, the jury is the sole judge of credibility of the witnesses and the weight of their testimony.” Weathersby Chevrolet Co. v. Redd Pest Control Co., 778 So.2d 130, 133 (¶ 10) (Miss.2001) (citations omitted). The jury certainly heard evidence that supported Morris Goodman’s claims and Gilmer’s claims. It was the jury’s role to resolve any conflicts. Accordingly, we cannot say that the jury’s verdict is against the overwhelming weight of the evidence. This issue is without merit.

*1211
IV. Attorney’s Fees

¶ 30. At the conclusion of trial, Morris Goodman filed a motion with the circuit court requesting $28,542.46 in attorney’s fees, which the court granted. Gil-mer argues that the court erred in awarding attorney’s fees to Morris Goodman without requiring credible evidence of the reasonableness of the fees charged. The standard of review for an award of attorney’s fees is abuse of discretion. T. Jackson Lyons & Assocs. v. Precious T. Martin, Sr. & Assocs., 87 So.3d 444, 448 (¶ 10) (Miss.2012). The award of attorney’s fees must be supported by credible evidence. Regency Nissan, Inc. v. Jenkins, 678 So.2d 95, 103 (Miss.1995).
¶ 31. Here, there was evidence of the actual attorney’s fees incurred by Morris Goodman. Morris Goodman attached an affidavit from its attorney to its motion for attorney’s fees. The affidavit detailed the attorney’s hourly rates and compared his rate to the rates of other attorneys in the Madison, Hinds, and Rankin County areas. Morris Goodman also submitted an itemized statement from its attorney, which reflected the work performed and the expenses incurred by the attorney. Accordingly, based on the evidence presented, we cannot say that the circuit court abused its discretion in awarding attorney’s fees to Morris Goodman. This issue is without merit.

V. Testimony of Wade Buie

¶ 32. Buie testified as a rebuttal witness on behalf of Morris Goodman. Gil-mer contends that the circuit court erred in failing to strike Buie’s testimony as hearsay. Gilmer, however, has failed to offer any authority to support his argument that the circuit court erred in allowing Buie’s testimony. As such, Gilmer’s challenge to Buie’s testimony is procedurally barred. See Tentoni v. Slayden, 968 So.2d 431, 441 (¶ 28) (Miss.2007).
¶ 33. Procedural bar aside, this issue is also without merit. Rule 801(c) of the Mississippi Rules of Evidence defines hearsay as a statement, other than one made by the declarant while testifying at trial, offered to prove the truth of the matter asserted. Here, Buie testified that a third-party company designed and manufactured the I-joists that Morris Goodman installed in Gilmer’s garage house. He also stated that the third-party company decided that the installed joists would be adequate to provide the required structural strength in the garage house. Buie never relayed the content of any of the conversations that he had with the third-party company. Therefore, Buie’s testimony does not meet the definition of hearsay, and the circuit court did not err in allowing his testimony. This issue is without merit.

VI.Indemnification Clause

¶ 34. Gilmer asserts that the circuit court failed to consider and properly interpret paragraph VIII of the construction contract. According to Gilmer, Morris Goodman agreed “to indemnify and hold [Gilmer] harmless” for any claims arising out of the construction of the home. Therefore, Gilmer, pursuant to paragraph VIII, cannot be held liable for any of Morris Goodman’s claims against him. We disagree.
¶ 35. Paragraph VIII of the construction contract, in its entirety, states:
Contractor will provide [workers’] compensation and general liability insurance protection for the duration of construction. Contractor indemnifies and hold[s] harmless [Owner] from any claims arising out of construction, to include attorney’s fees.
*1212 In interpreting contract language, the focus is on the contract’s objective language. Heritage Cablevision v. New Albany Elec. Power Sys., 646 So.2d 1305, 1313 (Miss.1994). An objective reading of paragraph VIII reveals that the indemnification clause refers specifically to workers’ compensation claims that arise during the construction of Gilmer’s house. There is no evidence and no additional language in the contract between Gilmer and Morris Goodman that would suggest that Morris Goodman intended to abandon its right to seek damages for a breach of the contract as Gilmer suggests. This issue is without merit.

VII. Inflammatory Remarks

¶ 36. Gilmer argues that Morris Goodman’s counsel continuously made inappropriate and prejudicial remarks throughout trial in an effort to prejudice the jury against him. The crux of Gilmer’s challenge is that Morris Goodman’s counsel erroneously alleged that Gilmer abused the judicial system. The specific line of questioning concerned the separate lawsuits that Gilmer had filed against individuals involved in the lawsuit against Morris Goodman. However, after an objection from Gilmer’s attorney, the circuit court disallowed the line of questioning.
¶ 37. Gilmer then asserts that the circuit court should have given a limiting instruction as a result of counsel’s statements. The comment to Rule 105 of the Mississippi Rules of Evidence, however, states that “[t]he rule requires that the party affected make a request to limit the evidence. If no request is made, ... existing practice suggests that no error has been committed.” Here, not only did the circuit court halt Morris Goodman’s attorney’s questions, but Gilmer did not request a limiting instruction. Consequently, the circuit court was under no obligation to issue a limiting instruction to the jury. Accordingly, this issue is without merit.

VIII. False Demonstration

¶ 38. Gilmer contends that Morris Goodman’s counsel presented a fraudulent demonstration to the jury. During closing argument, Morris Goodman’s counsel took a standard brick tie and placed it on the wall next to the jury box. He then fashioned a nail hole against the wall, leaving five inches to reach the prospective brick- and-mortar joint. Later he stated:
That, ladies and gentlemen, is a misrepresentation, to say that you’ve got to bend these things in half. If it is intended to be bent in the middle, you wouldn’t have nail holes all the way up to the end of it. That is what I’m talking about when I say credibility.
¶ 39. First, Gilmer did not object to counsel’s closing argument during trial. Therefore, he is procedurally barred from raising this issue on appeal. See Robinson v. Brown, 58 So.3d 38, 45-46 (¶23) (Miss.Ct.App.2011). Procedural bar aside, this issue is without merit. Morris Goodman’s counsel was not acting as an expert witness by making his demonstration during closing arguments. Counsel simply demonstrated his theory of the case to the jury: Morris Goodman followed the applicable rules while building Gilmer’s house. The demonstration was based on the evidence that had been presented to the jury, and Gilmer does not make any showing of prejudice to his case as a result of the demonstration. Accordingly, this issue is without merit.
¶ 40. THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THE APPEAL ARE ASSESSED TO THE APPELLANT.
*1213 LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.