# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00887-COA

RONALD OWENS A/K/A DO IT                                            APPELLANT

v.

STATE OF MISSISSIPPI                                                  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/19/2021 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/06/2022 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1. Ronald Owens was indicted for burglary of a business. After a jury trial, Owens was convicted. Owens appeals his conviction claiming it was against the weight of the evidence. After review, we affirm the judgment of conviction.

## FACTS

¶2. On Saturday, October 7, 2017, at approximately 8:11 a.m., an alarm at Henderson's Economy Pharmacy was triggered. The alarm company contacted the Clarksdale Police Department, and two officers were dispatched to the pharmacy. The officers scanned the building but found no evidence of a burglary and left the scene.

¶3.     On Monday morning, October 9, 2017, the pharmacist and owner of Economy Pharmacy, Val Soldevila, came to work and noticed the back door to the pharmacy was unlocked.  Soldevila entered the pharmacy and noticed a ladder in his office.  Soldevila noticed the alarm system was no longer operating. Clarksdale Police Officer William "Whit" Read would later testify it appeared the video surveillance system in Economy Pharmacy had been disabled; either the wire had been cut or had been unplugged. Soldevila also found the narcotics cabinet had been "pried open, . . . [and] most of the narcotics were missing." Soldevila called 911. Clarksdale Police Officer Norman Starks arrived at Economy Pharmacy and began processing the scene.

¶4.     Read also arrived at the scene and began investigating by walking the perimeter of the pharmacy to determine what businesses nearby had cameras that may have recorded the burglary. One business that had security camera footage from October 7, 2017, was Neveah Hospice.  The footage showed the officers arriving in response to the call on Saturday, October 7, 2017, and then leaving.  The video later showed a suspect wearing a backpack, walking out of the back door of Economy Pharmacy.  The suspect then walked down the highway toward the Double Quick gas station and out of view of the camera.  Having reviewed the footage, Read would later testify, "[Y]ou could tell it's a male or it's a human-comes out, is walking, has black pants, kind of white colored shoes, top . . . . I could clearly tell that it had a backpack on."

¶5.     After obtaining the video from Neveah Hospice, Read contacted the Double Quick gas station to obtain security camera footage of the time in question.  After watching the

footage, Read took a photograph of a black male standing at a food station in the gas station. Read felt that the male matched the description of the male suspect seen in the Neveah Hospice video. Read sent the photograph to officers at the police department to see if anyone could identify the suspect. Officer Daryll Taylor identified the suspect in the photograph as Ronald Owens. Officers then obtained a warrant for Owens' arrest and went to his home and place of employment but could not locate him. Owens turned himself in to police later that day.

¶6. After Owens' arrest, officers obtained a warrant and searched Owens' home. Officers found a red and black bag, a prescription pill bottle for Lortab with Owens' name on it from a different pharmacy, and a prescription medicine bottle without Owens' name on it, which had an Economy Pharmacy label and a red X on it. The Economy Pharmacy bottle was a "supply bottle" that was used to fill prescriptions. On January 6, 2018, a grand jury indicted Owens for burglary of a business. On March 17 and 18, 2018, a trial was held.

¶7. The State's first witness was Officer Starks. He testified that when he arrived at Economy Pharmacy, he walked through the pharmacy with Soldevila. The entire walkthrough was recorded on Officer Starks' body camera. That footage was admitted into evidence and played for the jury. In the video, Soldevila told Starks, "The back door was opened. I don't know what . . . happened to the alarm." Soldevila told Starks that whoever burglarized the pharmacy left their ladder in his office and unplugged the pharmacy's security cameras. Soldevila stated that he believed the burglar went into the ceiling to unplug the video system.

¶8.     The video continued: while Starks took photographs of the scene, Soldevila stood next to his office chair and asked him, "Y'all want a footprint?"  Starks stated that the print looked like an "Air Force One"[1] and took a photograph of the chair.  Starks also climbed the ladder to look in the attic.  He noted that there was a large hole in the pharmacy's roof that was big enough for a person to slide in.

¶9.     After the video ended, the direct examination of Starks resumed.  Starks testified that he determined the burglar's point of entry was "on top of the roof, and they actually came down in that far corner of the office through the ceiling." Starks testified that nothing was collected as to the footprint for testing at the lab.  Starks also testified that he did not see any red bags or duffle bags while he was in the pharmacy.

¶10.    The State's next witness was Darryl Johnson, the CEO of Neveah Hospice.  Johnson testified that he allowed officers to look at the hospice center's surveillance footage. During his testimony, the security footage from Neveah Hospice was admitted and played for the jury. The footage was very grainy.  At 15:18 minutes, the suspect exited the building through the back door.  The suspect had on a black shirt, jeans, and white shoes.  The suspect also put a black bag on his back and walked off-screen.

¶11.    The State then called Kalista Vincent as a direct witness. Vincent was employed as a theft-prevention employee with the Double Quick.  Vincent testified that the police asked

---

[1] An Air Force One is a popular tennis shoe made by Nike. The body-camera footage did not show the actual footprint. No photos of the footprint were admitted into evidence. Starks testified without objection that the footprint looked like an Air Force One based on his personal knowledge of owning Air Force One shoes. No expert opinion was offered on this issue. No one testified during trial as to whether Owens owned a pair of Air Force One shoes.

her to view and pull the video from the Double Quick from October 7, 2017. Vincent testified she obtained the video from the Double Quick during the time requested and provided it to the police.

¶12. Officer Read testified next, stating that he walked the perimeter of the pharmacy to see if any neighboring businesses had security footage of October 7, 2017. Read noted that Neveah Hospice had cameras. Read testified that he could tell the suspect "has black pants, kind of white colored shoes, top." Further, Read added that as the suspect got near the street, the suspect started in a northerly direction, toward the Double Quick. Read testified the suspect in the footage had on a backpack. Read stated that Saldovila told him the pharmacy gave its customers red and black backpacks. Read stated that after seeing the hospice footage, he began looking for other businesses with cameras in the direction the suspect walked.

¶13. Read testified that he knew the Double Quick was in the area the suspect walked, so he contacted Vincent to request camera footage from 9:00 a.m. to 10:00 a.m. or 11:00 a.m. on October 7, 2017. Read testified that in the video from the Double Quick, he could see a figure with a backpack that looked similar to the one he had seen with the person leaving the pharmacy and walking into the Double Quick's parking lot. Read testified that he tracked the movement of the suspect and saw the suspect stop at the area where the Double Quick sold chicken and french fries. Read took a still shot of the suspect from the Double Quick video. Read testified that he disseminated that photograph to the police department in hopes of someone identifying the suspect. After Read sent the photograph out, he handed the case over to Investigator Eddie Earl.

¶14.    On cross-examination, Read agreed that he could not say for certain that the suspect in the Neveah Hospice video and the suspect in the Double Quick video was the same person. Read also agreed that he could not see the suspect from the Neveah Hospice video walk the entire distance to get to the Double Quick. Read stated that he determined it was the same person because both had backpacks.[2] Read testified that he did not know whether the backpack or any of the stolen narcotics were ever recovered, he did not know whether fingerprints were "lifted" from the scene, and he did not know if there was any DNA or physical evidence linking Owens to the burglary.

¶15.    Officer Eddie Earl, a criminal investigator for the Clarksdale Police Department, testified next. Earl stated that Starks contacted him to investigate a burglary at Economy Pharmacy. After Starks contacted him, Earl contacted Read and learned Read was looking at surveillance footage from October 7, 2017. Earl also went to Economy Pharmacy and spoke with Soldevila, who showed Earl a "prying tool" that had been left behind by the burglar. Earl testified that he did not know whether the tool had ever been tested at the crime lab. Earl stated that Read sent him a "still shot" of an individual at the Double Quick, and Earl asked officers in the police department if they knew the suspect. Another officer, Taylor, identified the individual as Owens. Earl prepared an arrest warrant. Earl testified that he went to Owens' home to arrest him, but Owens was not there. Earl stated that he also went to Owens' place of employment, but Owens was not there either. Later that day, Owens

---

[2] On redirect examination, Read stated that he was confident the man leaving the pharmacy was the same man he saw at the Double Quick because the videos show someone of the "same height, same type of jeans, [and] same tennis shoes. . . ."

turned himself in to the Clarksdale police.

¶16.     Earl testified that after Owens' arrest, he executed a search warrant on Owens' home. The search yielded a red and black bag, a prescription pill bottle with Owens' name on it, and a prescription medicine bottle without Owens' name on it.  Earl testified that the prescription medicine bottle actually had an Economy Drugs label on it. Earl testified that he sent the items to the crime lab for testing, but he did not know what the results of testing were.

¶17.     On cross-examination, Earl testified that the red and black bag found at Owens' home "appeared" to be the same bag that the person leaving Economy Pharmacy had on his back in the Neveah Hospice video.  Earl also testified that the bag "appeared to have looked like the bag that Mr. Ronald Owens had in his possession at the time of the Double Quick video."[3] Earl stated that he did not recall any physical evidence, fingerprints, or DNA evidence that was gathered that linked Owens to the burglary. Earl testified that Owens was arrested based on the still shot and the videos.

¶18.     On redirect examination, Earl testified that he was never able to confirm whether the bag found at Owens was similar to the bags Soldevila stated were at Economy Pharmacy. However, Earl stated that he did learn that checks and a red and black bag were missing from

---

[3] The bag, which causes great concern to the dissent, was admitted into evidence by the defense during Earl's cross-examination. The jury was able to see the actual bag. The jury was also able to view the surveillance videos. The jury was presented with concerns about the bag in the defense's closing argument. "As an appellate court, we are not permitted to sit as the "thirteenth juror" and 'assume the role of juror on appeal.'" *Green v. State*, 312 So. 3d 1214, 1218 (¶18) (Miss. Ct. App. 2021) (quoting *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017)). "[I]t is the function of the jury to pass upon the weight and worth of the evidence and to determine the credibility and veracity of the witnesses." *Jones v. State*, 326 So. 3d 521 (¶43) (Miss. Ct. App. 2021) (quoting *Pate v. State*, 419 So. 2d 1324, 1326 (Miss. 1982)).

the pharmacy.

¶19. The State's next witness was Officer Darrell Taylor, a patrol officer at Clarksdale Police Department. Taylor testified that he identified Owens from the still shot that Officer Earl showed officers. Taylor stated that he knew Owens because Owens had called the police several times and because he had seen Owens "walking around the neighborhood." Taylor testified that he was able to determine the suspect in the photograph was Owens based on "his features [and] his short afro at the time."

¶20. The State's final witness was Val Soldevila, the owner and pharmacist at Economy Pharmacy. Soldevila testified that on October 7, 2017, he got a call that the alarm system at the pharmacy had been triggered. Soldevila stated that he was told "everything looked okay at the time," so he did not go to the pharmacy that day. Soldevila stated that on October 9, 2017, he drove to the pharmacy, and when he tried to unlock the back door, it was already "unlocked." Soldevila testified that he was not concerned because he thought "we forgot to lock the door going out." When Soldevila went into the pharmacy, Soldevila "saw that the alarm system was also not operating." Soldevila stated that he walked into Economy Pharmacy and "saw where it[] had a break-in." Soldevila testified that he went into his office and saw "a ladder coming down from the ceiling." Soldevila also noticed that the "narcotic cabinet was pried open." Soldevila testified that after seeing these things, he called the police.

¶21. Soldevila testified that when he did a full inventory of the stolen narcotics, he discovered that over $17,000 in narcotics and controlled substances had been stolen.

8

Soldevila stated that he had a cabinet full of red and black bags that he used for conferences and conventions. Soldevila explained that all these bags had "QS1" logos on them. However, when asked if he recognized the red bag found at Owens' home, Soldevila stated that he did not recognize the bag. Soldevila testified that the bags in his office were more like handbags, not a luggage bag like the one recovered from Owens' home.

¶22. The State introduced a photo of the bottle found in Owens' home from Economy Drugs that did not have patient information on it but had a "red x" on it. The economy bottle was a "stock bottle" used to "pull medication from to dispense, either liquid or pill." Soldevila testified that the bottle should have been obtained only by prescription, but the lack of patient information meant it had not been prescribed to anyone. The bottle contained Promethazine, which was one of the medications reported stolen during the burglary. The State argues this bottle could have been stolen during the burglary. Soldevila could not confirm whether the bottle was stolen during this particular burglary.

¶23. On cross-examination, Soldevila testified that he could not say "specifically" that the bottle found in Owens' home was the one that was stolen from his narcotics cabinet on October 7, 2017. After Soldevila's cross-examination, the State rested. The defense moved for a directed verdict, but the trial court denied the motion. The defense called no witnesses The trial judge stated, "I can't say it's the strongest case of burglary of a business that I've heard, but, you know, it comes down to a question of identification, and I do think that's—they've presented enough, at least in the form of reasonable inferences, that a jury might convict the defendant. Therefore, I'll deny that motion."

9

¶24. The jury found Owens guilty of burglary of a business. Owens was sentenced to seven years in the custody of the Mississippi Department of Corrections as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81 (Rev. 2015). Owens filed a post-trial motion for judgment notwithstanding the verdict or a new trial, which was denied. Owens appeals, and after review, we affirm.

**ANALYSIS**

¶25. On appeal, Owens' sole argument is that his conviction is against the overwhelming weight of the evidence. We review the denial of a motion for a new trial for abuse of discretion. *Wilson v. State*, 343 So. 3d 1041, 1048-49 (¶28) (Miss. 2022). "When determining whether a jury's verdict is against the overwhelming weight of the evidence, this Court has stated that 'the scope of review on this issue is limited in that all evidence must be construed in the light most favorable to the verdict[.]'" *Gilmer v. Morris Goodman Builders Inc.*, 131 So. 3d 1203, 1210 (¶27) (Miss. Ct. App. 2013) (quoting *R. McKnight Son v. C. & I Ent.*, 100 So. 3d 1022, 1026 (¶11) (Miss. Ct. App. 2012)). We "will reverse only when the verdict is so contrary to the evidence that to allow it to stand would sanction an unconscionable injustice." *Wilson*, 343 So. 3d at 1049 (¶28) (internal quotation marks omitted).

¶26. Owens was indicted for burglary of a business under Mississippi Code Annotated section 97-17-33 (Rev. 2014) as a habitual offender under Mississippi Code Annotated section 99-19-81. Section 97-17-33(1) reads:

> Every person who shall be convicted of **breaking and entering**, in the day or night, any shop, **store**, booth, tent, warehouse, or other building or private room or office therein, water vessel, commercial or pleasure craft, ship, steamboat, flatboat, railroad car, automobile, truck or trailer in which any

10

**goods, merchandise, equipment or valuable thing shall be kept for use, sale,** deposit, or transportation, with **intent to steal therein**, or to commit any felony, or who shall be convicted of breaking and entering in the day or night time, any building within the curtilage of a dwelling house, not joined to, immediately connected with or forming a part thereof, **shall be guilty of burglary**, and imprisoned in the penitentiary not more than seven (7) years.

(Emphasis added).

¶27. Here, there is no doubt the State proved a breaking and entering occurred on October 7, 2017, at Economy Pharmacy, an ongoing business operating in Coahoma County. The State proved that over $17,000 of narcotics and controlled substances that were for sale at the pharmacy were stolen during the burglary. The essential question before us is whether the verdict convicting Owens of that burglary is so contrary to the weight of the evidence that an unconscionable injustice occurred. Owens argues the State presented no credible evidence to link Owens to the burglary. A review of the evidence yields a different conclusion than that asserted by Owens.

¶28. The State introduced the "stock bottle" from the Economy Pharmacy that was found in Owens' home. Soldevila could not say whether this specific bottle was stolen during this specific burglary. However, Soldevila did testify that "stock bottles" are "what we pull medication from to dispense." Soldevila testified that the stock bottle was indeed from Economy Pharmacy. There was no valid reason presented for Owens to possess this type of refill bottle from Economy Pharmacy. The jury could reasonably infer from this evidence that the bottle was stolen during the burglary. As discussed, *see supra* note 3, when there is conflicting evidence presented, the jury is charged with weighing that evidence.

¶29. Further, the State relied heavily on two surveillance videos to circumstantially prove

11

Owens was involved in the burglary. The State's exhibits four and five were the surveillance videos from Neveah Hospice and the Double Quick gas station. The Hospice video shows a male wearing a black shirt, jeans, white shoes, and a bag on one shoulder. The Hospice video shows the suspect leaving Economy Pharmacy and walking in the direction of the Double Quick. The Double Quick video shows an individual with a similar walk, height, and clothes, and with a bag over his shoulder walking into the Double Quick. While inside, the video shows the suspect's face and the color of the bag on his shoulder to be red and black. Officer Taylor testified that "the individual in the photo appeared to be Ronald Owens." Finally, the jury was shown the surveillance footage and the arrest photo of Ronald Owens. As discussed above, based on the evidence and testimony before them, the jury was the trier of fact and had to determine whether the suspect in the surveillance footage was Owens.

¶30. Finally, the State introduced the red and black bag found in Owens' home. It is clear from the surveillance footage from Neveah Hospice that the suspect is carrying a bag over one shoulder. Officer Taylor identified Ronald Owens as the person in the Double Quick video carrying a red and black bag over his shoulder. A red and black bag was found in Owens' home. Officer Earl testified that "it appeared to have looked like the bag that Mr. Ronald Owens had in his possession at the time of the Double Quick video." It was for the jury to decide whether the bag found in Owens' home was the same bag being carried by the suspect in the surveillance videos and whether this bag was circumstantial evidence of guilt.

**CONCLUSION**

¶31. The State relied heavily on surveillance footage, and identification of Owens from the

12

footage was the function of the jury. Again, this court will only disturb a jury verdict if it is "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *State v. Murphy*, 202 So. 3d 1243, 1259 (¶39) (Miss. 2016); *see also Gilmer*, 131 So. 3d at 1210 (¶27). After review, the jury's verdict to convict Owens of the burglary is not so contrary to the evidence, when viewed in the light most favorable to the verdict, that an unconscionable injustice would be sanctioned without reversal. There was sufficient evidence for the jury to consider in reaching the verdict. We cannot say the trial court abused its discretion by denying the motion for a new trial. Therefore, Owens' conviction for burglary of a business is affirmed.

¶32.    **AFFIRMED.**

    **BARNES, C.J., CARLTON, P.J., GREENLEE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., WESTBROOKS AND McDONALD, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

    **McCARTY, J., DISSENTING:**

¶33.    Because the only thing proved in this case was that Ronald Owens went to a gas station for breakfast—an action which, if criminalized, would require the arrest of almost every person in the State of Mississippi—his conviction for business burglary must be reversed and rendered.

¶34.    The facts we know are wholly uncontested. On a Monday morning, a pharmacist discovered his pharmacy had been robbed over the weekend. Even though the police had responded to an alarm from the morning the pharmacy was possibly robbed, they failed to

13

check the back door, which the pharmacist found unlocked.

¶35.　　Once he went inside, he found a ladder and a small tool. It seemed as though someone had climbed down from the roof into the store. And a safe filled with an estimated $17,000 in narcotics was open and the contents were missing.

¶36.　　The cameras inside the pharmacy had been unplugged, and there was no interior footage from the burglary. But the ladder was left from the break-in, a shoeprint was on a chair, a knife found on the roof, and a small chisel left in the pharmacist's office.

¶37.　　Here's where the breakdowns begin.

*From the testimony of Captain Norman Starks, Clarksdale Police Department*:

```
Q.   Do you know whether there were any — anything
taken from the shoe print and sent to the lab for
testing?

A.   No, sir.

Q.   What about the knife? Was it sent to the lab for
testing?

A.   The knife was sent to the lab, but I don't know
what testings or anything was done on it.

Q.   Okay. What about the ladder?

A.   I don't know if the ladder was sent off.
```

¶38.　　In addition to the wealth of untested evidence from the crime scene, the police also reached out to two local businesses to see if they had any video footage which might include the pharmacy. The first was a hospice by the drugstore, and the other was the Double Quick gas station. The hospice footage had something on it.

*Testimony by Whit Read, former police officer, Clarksdale Police Department*:

I see it's a back door on the right hand corner if you're facing the building. If we were facing the back of the pharmacy, it would be kind of to your right. I see an image come out. At first I see -- and then you could tell it's a male or it's a human -- comes out, is walking, has black pants, kind of white colored shoes, top. As he gets to the street, I could see it a little better, and then it (sic) starts in a northerly, towards 61, which is where -- if you were coming that way, you'd be going toward Double Quick.

Kind of stops behind a bush. Really couldn't tell what was going on there. Just kind of fumbling around in a bag. Maybe something fell out. But when it -- when the image comes out from behind the bush, I could clearly tell that it had a backpack on. I kind of focused on that to try to determine what kind [of backpack] it was, but in that video, I was unable to do so.

¶39. The following is a still from the hospice video that the former officer narrated for the jury. The pharmacy is the green-roofed building at the upper left, and the suspect is walking away, at the upper right:



15

¶40.    And here is a close-up of the figure from the hospice video:



¶41.    Then-Officer Read also reviewed footage from the Double Quick, which was surveilled by multiple cameras. He reviewed footage from the parking lot and the interior. He thought he could "match" the footage from the hospice to the gas station and wondered if the person on a video from the parking lot was the same as the one who had left the pharmacy. And specifically, he "tried to focus on the way the individual had the backpack."

¶42.    While then-Officer Read was devoted to puzzling out the identity of the pixilated person or persons on these videos—focusing again "on the way the individual had the backpack"— the evidence from the crime scene was left neglected. Just like Captain Starks, he also didn't seem to gather any actual evidence or try to test it:

        Q.  .  .  . And were there any items collected at the
        scene?

        A.   Yes.

        Q.   What was collected?

        A.   There was a knife collected. I think they might
        have  dusted  for  some  prints.  I'm  not  sure  of
        anything else being collected. During that time, I
        was  talking  to  [the  pharmacist]  about  his  drug

16

inventory.

Q.   Okay. So did you collect any prints or dust for
any prints?

A.   No.

Q.   Did you collect any evidence?

A.   No.

¶43.   But back to the surveillance footage, one from the inside of the Double Quick showed a person in line with a backpack on, which somehow gets us to where we are today.  In a still made by the police department, he is shown with a very bright red backpack slung over his shoulder.



Even though this person is carrying a bright red backpack, and not a black one like the figure in the hospice video, Officer Read landed him as a suspect. As his testimony showed, the only reason he was developed as a "person of interest" is because he had a backpack, *even though it was a different color*.[4]

¶44. The former officer narrated his thought process for the jury:

```
     . . . the video contained an individual in the
store, [he] kind of went around -- went around and
came around when you buy your chicken or french
fries or whatever, and then I could see the backpack
pretty good. I could see what color it was.
So I called [the pharmacist,] Mr. Val. I said, "Mr.
Val, do y'all have any type of backpacks or anything
that y'all would've had in the store that y'all give
to your customers or for sale or what not?"

And he said, "Yes, I do."

And I said, "What color?"

He said, "Red and black."

I said, "Thank you," and I ended the call, and I
said,"You know, this is -- this is a person of
interest."
```

---

[4] A note about the colors of the backpacks carried in the hospice and gas station footage. The hospice video is in color—we can see the green roof of the store, the red roof of the donation box by one of the parking lots, and green grass. But the Bigfoot figure throughout the footage is carrying what appears to be a completely black bag.

In the video, we can see the figure in silhouette walking by the red-roofed donation box. The red of the box contrasts with the all-black upper body form of the figure. We can also ascertain white tennis shoes. But no red can be seen on that figure.

In contrast, in the interior footage from the gas station, the person identified as Ronald Owens is carrying a bright red bag. A reasonable person could not conclude that the bright red bag carried by this person is the same as the black one carried by the person in the hospice footage.

18

¶45.　The person in the video ended up being identified as Ronald Owens.  Once the police got a search warrant for his home, they found "a red and black bag," plus two pill bottles. One was in Owens' name, for hydrocodone, from a different pharmacy.  The other did not have a prescription label on it.

¶46.　To elaborate on why they were asking about the backpack, one of the other officers—former officer Eddie Earl—had seen some red and black bags at the pharmacy, and apparently the going theory was that the perpetrator of the business burglary broke in, then used one of the bags to load up the contents of the narcotics cabinet, and after walked next door to get breakfast.

¶47.　The problem being, the jury heard the pharmacist say that wasn't one of the bags he had in his pharmacy.  Surprisingly, they heard this through his direct testimony:

```
Q.  . . . Let me ask you, were you did you ever have
any bags or purses for personal use in your office?

A.  Yes.

Q.  Tell us about those bags.

A.  Well, I have a cabinet that I keep bags that --
you  know,  when  I  go  to  conferences  or  state
conventions, I have, you know, a cabinet, you know,
full of them actually.

Q.  And what color were those bags?

A.  Most of them are, you know, red, red and black.

. . .
[the  witness  is  shown  the  bag  seized  from  Owens'
house]

Q.  Mr. Soldevila, do you recognize this bag?
```

19

```
A.   No.

Q.   So you don't recognize this as a bag belonging
to you?

A.   No.
```

¶48.    After failing to tie the bag from Owens' house to one that could have been stolen from the pharmacy, the State tried another route.  The shift was to the blank pill bottle found at Owens' house, which the State theorized was stolen from the pharmacy.  The pharmacist agreed it looked like a "stock bottle," one where "we pull medication from to dispense [to other bottles], either liquid or pill."  They had this kind of bottle at the pharmacy, he explained.

¶49.    But on cross, the pharmacist admitted he could not say the bottle recovered from Owens' house was stolen from the pharmacy—testifying, "Not specifically, no," when asked if it was one of the things taken in the burglary.

*Former Clarksdale Police Department Officer Eddie Earl:*

```
Q.   Okay. So to follow up on what you do know,
during   the   time   that   you   performed   the
investigation, did you -- do you know of any
physical evidence against Mr. Ronald Owens that was
collected from the crime scene?

A.   I don't recall any physical evidence collected
except of the items that I collected.

Q.   And the items you collected, can you -- did you
find Mr. Owens' fingerprints on those items?

A.   I didn't get the lab results back to I was on
patrol - reassigned to patrol at that time.

Q.   Well, did you get any DNA off of those -- off of
that evidence?
```

```
A.  As far as any of the evidence results, I didn't
get a chance to look at that report because I had
been [] reassigned.

Q.  Okay. So, again so Mr. Owens was arrested based
on just those pictures that you saw?

A.  The video footage also.

Q.  Yes, sir.

A.  Um-hum.

Q.  And that's it?

A.  Yes, sir.
```

(Emphasis added).

¶50.   On cross, Whit Read, the former officer who developed the idea of Ronald Owens as a "person of interest" was asked if police found the backpack, or the missing $17,000 in narcotics, or . . . anything at all.

```
Q.   . . . Now, do you know whether or not the
backpack that you saw was ever recovered?

A.  No, sir, I do not.

Q.  Do you know whether or not any of the narcotics
that were allegedly taken were they recovered?

A.  No, sir, I do not.

Q.  Do you know whether or not any fingerprints was
(sic) lifted and of value or identified as it
relates to the crime scene?

A.  No, sir, I do not.

Q.   Do you know whether or not any DNA results
connecting my client, Ronald Owens, to the crime
scene at all?

A.  No, sir, I do not.
```

21

¶51. In the end, the police never recovered the stolen narcotics, they either didn't lift any fingerprints from the crime scene (whether from the ladder, the ripped open roof, the knife found on the roof, the chisel, or the safe) or didn't test at all, didn't match the ladder or the knife or the tool to Ronald Owens, didn't match the blank pill bottle found at his house to the pharmacy, the pharmacist testified Ronald's red backpack didn't come from his stash at the pharmacy, and the video footage could not be matched to the person of interest.

¶52. The crime of "business burglary . . . require[s] the State to establish [a defendant] broke and entered into a [non-dwelling] building with the intent to steal or to commit another felony." *Gray v. State*, 931 So. 2d 627, 633 (¶25) (Miss. Ct. App. 2006); *see* Miss. Code Ann. § 97-17-33(1) (Rev. 2014). There was simply not an iota of proof adduced that Ronald Owens broke into anything. Perhaps the vague figure seen leaving the pharmacy on the hospice video broke into the store. But there is no proof that person is Ronald Owens, and there was no more proof beyond the video upon which the verdict could rest.

¶53. As former Officer Read said of what evidence they had connecting Ronald Owens to the crime, "that's it"—the blurry, grainy footage was *all they had in terms of proof*.

¶54. This is not nearly enough. For the State's burden is not just "maybe this guy walked by," but that Ronald Owens committed the crime of business burglary *beyond a reasonable doubt*. But not a single pill from the pharmacy was found at his house, the pharmacist didn't recognize the bag the State guessed was stolen, and either no one bothered to check for fingerprints or DNA on the ladder, knife, chisel, opened safe, or back door—or they didn't find anything.

22

¶55. The Supreme Court has ruled that in reviewing a case of this type, "we weigh the evidence in the light most favorable to the verdict, only disturbing a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017) (cleaned up). We are not to sit as some kind of proxy juror, and even if we wanted to, "our capacity for such is limited in that we have only a cold, printed record to review." *Id*. Instead, when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Id*.

¶56. To return to that first sentence, we will reverse a conviction only "when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." With respect to my colleagues in the majority, I submit this is just such a case. The evidence in this case does not conflict because frankly there was no evidence.

¶57. Ronald Owens was sentenced to serve seven years for this felony conviction. The only proof in this record of any action he took is that he stood in line to buy breakfast at a gas station. To allow this conviction to stand in the utter absence of evidence is an unconscionable injustice, and because I believe it must be reversed and rendered, I respectfully dissent.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**